IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEE M. ROBY,

    Plaintiff,

    v.

AMERICAN AIRLINES, and DOES 1 through 50, inclusive,

    Defendant.

No. C 04-4650 JSW

**ORDER GRANTING SUMMARY JUDGMENT**

Now before the Court is the motion for summary judgment filed by American Airlines ("American"). Having carefully considered the parties' arguments, the relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS Defendant's motion for summary judgment.

**BACKGROUND**

Plaintiff Dee M. Roby ("Plaintiff") was employed by American from July 6, 1976 until November 20, 2003. She worked in various capacities in several cities, and began work at the San Francisco airport as a Premium Services representative in approximately 1999. (Declaration of Paula Champagne ("Champagne Decl."), Ex. A at 23:25-29:2.) In 2001, Plaintiff suffered three separate neck and back injuries while at work, and workers compensation claims were filed for these injuries. (*Id.*, Ex. A at 42:12-20; 50:2-4; 63:10-64:1.) On August 26, 2002, as a result of these injuries,

Dr. Mark Sontag advised Plaintiff that she should not lift more than twenty pounds or sit for long periods of time. (First Amended Complaint, ("FAC") ¶ 10-11.)[1] Plaintiff was able to work around this medical restriction because her job duties did not require her to sit for eight hours a day. (Champagne Decl., Ex. A at 122:25-123:15.)

In October 2002, Plaintiff participated in a conference call at which she learned that American's Premium Services was going to be reorganized, and that her job description would change. (*See* American Airlines's Response to Plaintiff's Submission of Documents Pursuant to Court Order ("Def. Supp."), Ex. at 114:18-115:25.) At the end of the conference call, Plaintiff asked whether her new job description would require her to sit for extended periods of time. (*Id.*, Ex. at 117:16-118:4.) In response to this question, she was asked to call Debra Wallen, one of the two managers participating in the conference call, directly at her office after the conference call was completed. (*Id.*, Ex. at 118:5-10.) Plaintiff called Wallen, and told her that she could not sit for eight hours at a time, to which Wallen responded by asking whether Plaintiff was saying that she could not perform her job. (*Id.*, Ex. at 119:22-25.) When Plaintiff was given a copy of her new job description, she thought that she could work around her medical restrictions even though the new description called for longer periods of sitting. (*Id.*, Ex. at 123:6-125:21.)

In November 2002, Plaintiff went on medical leave for reasons unrelated to her prior injuries, and returned to work in April 2003. (Champagne Decl., Ex. A at 142:18-23, 146:22-24.) Her new job duties included working at the Admirals Club five days a week, and she now reported to a new manager, Pat Newton. (*Id.*, Ex. A at 146:25-148:2.) She was able to perform this new job despite her medical restriction because she could stand when she needed to, and some of her job duties required her to move around a lot. (*Id.*, Ex. A at 148:3-25.) On July 11, 2003, Dr. Sontag released Plaintiff from her medical restrictions, allowing her to sit for eight hours per day. (Def. Supp., Ex. at 150:4-14.)

---

[1] This fact is not supported by any evidence presented in the record, but does not appear to be challenged by the defendant. It is included here in order to adequately explain the factual background.

In May 2003, Plaintiff received a call from Barbara Kelly, in which Kelly asked Plaintiff to see about upgrading a passenger, Eric Hensley, on an upcoming flight. (Declaration of Paula Newton ("Newton Decl.") ¶ 8-9.) Kelly was a retired American employee, who had worked at the San Jose airport. (*Id.*) Kelly was an acquaintance of Plaintiff's, and Hensley was Kelly's nephew, although Kelly did not tell Plaintiff that at the time of the call. (*Id.* ¶ 8; Champagne Decl., Ex. A at 172:21-174:2.) Hensley had a VIP certificate, which could be used to upgrade his fare if any "C" class seats were available. (Newton Decl. ¶ 14.) Plaintiff called another American employee, Sally Jeung,[2] and asked her to upgrade Hensley to business class. (Champagne Decl., Ex. A at 168:19-171:25.) Jeung told Plaintiff that there were no "C" class seats available, only "J" class seats, which were not available for upgrades with VIP certificates. (*Id.*) Plaintiff told Jeung that she had always done upgrades to "J" class, and to go ahead and do this upgrade. (*Id.*) Plaintiff then entered notations in Hensley's passenger record indicating that the upgrade was done at the request of "SJC/Kelly," and that the VIP certificate was collected, when in fact the certificate was returned to Hensley. (*Id.*, Ex. A at 172:12-25, 177:9-184:13.) Later, another co-worker explained to Plaintiff that the upgrade procedure had changed while Plaintiff was on medical leave, and that VIP certificates could only be upgraded to "C" class seats. (*Id.*, Ex. A at 184:9-25; Newton Decl. ¶ 12.)

Newton began an investigation into the irregularities of the upgrade. During the course of this investigation, Newton corresponded with Dan Stefek, a Management Advisory Services representative at American. (Supplemental Declaration of Pat Newton ("Newton Supp. Decl.") ¶ 3.) In the course of these correspondences, Newton wrote the following to Stefek in an email:

> I'll give you a little back ground on Dee. She has used her position in Premium Services to her advantage. She does not know her limits. I found a letter in her Pfile from a customer thanking her for the upgrade to F/C and giving her some kind of gift as a thank you. Her coworkers do not like her because of all her deal making. This has been going on for years. She filed an [sic] harassment complaint after I opened this investigation. She has hired an attorney. She thinks I will back off because of that and I will not. TC Cohen is here now investigating the harassment claim.

---

[2] Defendant's motion spells this individual's last name as Young, but the excerpts of the record indicate that it is Jeung. The Court uses the latter spelling here.

3

> There is no doubt in my mind, she gave this guy a comp upgrade and she has been doing things like this for years. I wish I could get her on a Rule 34,[3] but she's sharp enough to cover her tracks enough that we can't prove theft.

(Newton Supp. Decl., Ex. A.) Newton eventually concluded that Plaintiff failed to follow American's procedures, and made two misrepresentations in the passenger record: first by making it appear that an active employee of American at the San Jose airport asked for the upgrade, when in fact Kelly was retired, and second by stating that the VIP certificate was collected when Hensley still had the certificate. (Newton Decl. ¶ 14-15.)

As mentioned in Newton's email to Stefek, Plaintiff complained to Newton about harassment by coworkers. (Newton Decl. ¶ 16.) T.C. Cohen, a Human Resources Investigator for American, interviewed Plaintiff, three managers, and eleven coworkers regarding this complaint. (Declaration of T.C. Cohen ("Cohen Decl.") ¶ 4.) Cohen found no harassment towards Plaintiff, but concluded that Plaintiff had acted in an intimidating and abusive manner towards co-workers. (Cohen Decl. ¶ 6.) Cohen recommended that Plaintiff be sent to American's Abilities Clinic, where Cohen expected that anger management classes or some other sort of assistance would help address the Plaintiff's behavior. (Supplemental Declaration of Paula Champagne ("Champagne Supp. Decl.") Ex. D, at 42:3-43:16.) Plaintiff attended the meeting in June 2003. (Supplemental Declaration of Pat Newton ("Newton Supp. Decl.") ¶ 4; Declaration of F. Anthony Edwards ("Edwards Decl."), Ex. 2B at 46:25-47:2.) Plaintiff described her meeting with the doctor at the clinic as being a brief interview during which she was questioned about her relations with various coworkers, including whether she was in a romantic relationship with a female co-worker, whether she was taking lithium, and she was asked to provide contact information for individuals who knew about her background and history of employment with American. (Edwards Decl., Ex. 2B at 229:20-233:14.) Following Plaintiff's visit to the clinic, Newton received notice from American's medical department that Plaintiff had been evaluated, that she was able to perform the duties of her job, and that she

---

[3] Deliberate acts of giving out tickets or upgrades would constitute a Rule 34 violation, and results in an immediate termination. (Edwards Decl., Ex. 2D at 93:22-94:9.)

4

should be held to the same standards as other employees. (Newton Supp. Decl. ¶ 4.) Newton was not given any information about the evaluation or Plaintiff's medical status. (*Id*.)

During these same months, Plaintiff was also seeing a psychotherapist, who recommended that she take a week off work from May 9 until May 16. (Plaintiff's Submission of Documents Pursuant to Court's Order ("Pltf. Supp.") at 3-5.) Plaintiff's medical doctor agreed, and forwarded this recommendation to American's medical department. (*Id*.) The diagnosis identified by Plaintiff's psychotherapist and doctor was acute anxiety and stress, which included symptoms of being agitated, crying, and depressed. (*Id.*) On July 17, 2003, a second fax was sent from Plaintiff's doctor to American, stating that Plaintiff needed one month "medical leave for medical reasons." (*Id.* at 6; Champagne Supp. Decl., Ex. A, at ex. 20.) The documents from American's medical department indicate that the fax was received, but that on July 22, 2003, approval for this leave was withheld pending an ongoing issue. (Pltf. Supp. at 7.) There is no information in the record indicating the basis for the leave or the reason for withholding the leave, other than the unidentified ongoing issue. Plaintiff continued to report to work, and while Plaintiff stated that she knew her doctor wanted her to take a month off of work, she also stated that she did not know that her doctor submitted that request to American. (Edwards Decl., Ex. 2A at 233:15-234:15.)

At the conclusion of Newton's investigation into the ticket upgrade, and Cohen's investigation into any workplace harassment, Newton, Cohen, and Cathy Berg, another American manager, decided that Plaintiff's violations of American's policies required discipline. (Newton Decl. ¶ 19; Cohen Decl. ¶ 6; Declaration of Cathy Berg ("Berg Decl.) ¶ 6-8.) American has a five-tiered disciplinary approach, whereby managers can choose between informal counseling, a first advisory or written warning, a second advisory, placing the employee on a "Career Decision Day," or termination. (Newton Decl. ¶ 18.) In this case, Netwon and Berg concluded that a Career Decision Day was the appropriate discipline. (*Id.* ¶ 18.) In a Career Decision Day, the employee is given a day off with pay to reflect upon whether the employee wants to continue employment with American, and if so, the employee is required to sign a letter of commitment and agree to improve performance and comply with all

5

of American's policies in the future. (*Id*. ¶ 19-20.) On August 22, 2003, Berg and Newton met with Plaintiff, and informed her of their decision. (*Id*. ¶ 20.) Plaintiff signed the Career Decision Day letter, indicating her decision to continue working for American. (*Id*. ¶ 20.)

On October 4, 2003, two transportation vouchers were issued from a computer that the Plaintiff used. Each American agent has an identification number, or "die sine," that is required to access the ticketing computers, and American requires all agents to print out a copy of the transactions they have conducted during their shift. (*Id*. ¶ 21.) As part of her regular review of agent printouts, Newton noticed that the Plaintiff's printout included the issuance of these two vouchers, and thought it was unusual because Premium Service Representatives rarely issue transportation vouchers. (*Id*. ¶ 23.) Newton investigated these vouchers, and found that they were issued for non-refundable tickets, and that they were issued after the date of the flight. (*Id*. ¶ 24.) If the passengers had cancelled their tickets before the time of the flight, they could have exchanged the tickets for a $100 change fee, but in this case, the tickets had not been cancelled. (*Id*. ¶ 24-25.) Therefore, the tickets were worthless, and vouchers should not have been issued. (*Id*. ¶ 25.) Newton contacted American's Management Advisory Services and requested an investigation into this incident. (*Id*. ¶ 26.)

A few days later, Newton learned of another potential rule violation by Plaintiff. An Admirals Club member reported that Plaintiff had given him a Travel Now (a travel agency) business card with her name on it, which the member felt was inappropriate. (*Id*. ¶ 27.) Newton forwarded this information to Management Advisory Services, which asked Newton to begin an investigation herself. (*Id*. ¶ 29.) Newton contacted several other American employees, and found at least five other incidents where Plaintiff was reported to have given out a business card or otherwise solicited outside business. (*Id.* ¶ 30-32, 35-37.)

Toni Hamilton, a Human Resources Investigator for American, arrived in San Francisco on November 4, 2003. (Declaration of Toni Hamilton ("Hamilton Decl.") ¶ 4.) She interviewed Plaintiff regarding the transportation vouchers, and Plaintiff stated that she did not issue those vouchers, and that the bartender at the Admirals Club, Chet Patel, issued them. (*Id*. ¶ 7.) According to Plaintiff, Patel used her computer while she was filling her water bottle at

6

the water cooler. (*Id*. ¶ 7.) Hamilton also interviewed Plaintiff about the Travel Now business card. (*Id*. ¶ 9.) Plaintiff denied ever working for Travel Now, or handing out Travel Now business cards,[4] but admitted that she arranged some tours through Travel Now, although she did not take any money for it. (*Id*.) Hamilton asked Plaintiff to write out a statement regarding these two incidents. (*Id*. ¶ 10.) Plaintiff's statement stated only that she did not recall the details of either incident. (*Id*.) Based on this, as well as Plaintiff's behavior during the interview, Hamilton did not find Plaintiff credible. (*Id.* ¶ 11.)

Hamilton interviewed Patel, who stated that Plaintiff was the one who issued the vouchers, and that Patel had offered to pay the $100 change fee, but Plaintiff said it was not necessary.[5] (*Id*. ¶ 13.) Regardless of whether Plaintiff or Patel issued the vouchers, Hamilton concluded that Plaintiff violated American's policies by either improperly issuing the vouchers or failing to sign out of her computer when she stepped away. (*Id.* ¶ 12.) Plaintiff also failed to review her daily print-out of transactions and report this irregularity to management. (Newton Decl. ¶ 39.) Based on this investigation into the vouchers and the business cards, and in light of Plaintiff's recent Career Decision Day discipline, American's management concluded that Plaintiff should be terminated. Newton and Rick Kustuch, Regional Manager for Premium Services, met with Plaintiff on November 20, 2003, and informed her that her employment was terminated. (Newton Decl. ¶ 41.) Plaintiff subsequently brought this suit against American.

## ANALYSIS

**A.  Remaining Claims**

Plaintiff's First Amended Complaint states eleven causes of action, eight of which were previously dismissed without opposition. Only the fourth, sixth, and eighth causes of action

---

[4] According to Plaintiff's deposition, at some point after her Career Decision Day, Plaintiff spoke to Anita Douglas, owner of the Travel Now travel agency about possibly working for Travel Now in the future. (Champagne Decl., Ex. A at 267:13-19.) While Plaintiff did not start working for Travel Now, she ordered a set of Travel Now business cards with her name and contact information on them. (*Id*., Ex. A at 266:13-17.) In contradiction to Plaintiff's statement to Hamilton, she admitted in her deposition that she gave one of Douglas's Travel Now business cards to a passenger while she was on duty at American. (*Id*., Ex. A at 277:11-25.)

[5] Patel requested these vouchers for two Hindu priests who were members of his temple. (Hamilton Decl. ¶ 13.) He stated that he did not know that the tickets were worthless at the time. (*Id*.) Patel, who had never been disciplined before, was given a second advisory warning as a result of these events. (Newton Decl. ¶ 40.)

7

remain. Each of these causes of action is styled and labeled as pleading a single legal theory. However, construing the complaint liberally, the facts alleged in each cause of action state claims under multiple legal theories. Under the liberal pleading standard of the federal rules, "[s]pecific legal theories need not be pleaded so long as sufficient factual averments show that the claimant may be entitled to some relief." *Fontana v. Haskin*, 262 F.3d 871, 877 (9th Cir. 2001). In light of this standard, the Court will consider each of the legal theories that is adequately presented by the remaining portions of the complaint, *see e.g.* Crull v. GEM Ins. Co., 58 F.3d 1386, 1391 (9th Cir. 1995), so long as that theory was not one of those previously dismissed.

The Court considers the remaining causes of action to state the following claims: common law claims for wrongful termination in violation of public policy, unlawful termination in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Govt. Code § 12940, *et. seq.*, failure to engage in the interactive process in violation of Cal. Govt. Code § 12940(n), and unlawful termination with intent to interfere with an employee's benefits in violation of ERISA, 29 U.S.C. § 1140. The Court will address the specific claims as required in the analysis below.

**B.     Standards Applicable to Motions for Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine

issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In addition, the party seeking to establish a genuine issue of material fact must take care adequately to point a court to the evidence precluding summary judgment because a court is "'not required to comb the record to find some reason to deny a motion for summary judgment.'" *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

C.  **FEHA Claims and Exhaustion of Administrative Remedies**

To bring a statutory claim for a violation of FEHA, a plaintiff must first file a written complaint with the California Department of Fair Employment and Housing ("DFEH") and obtain a "right to sue" letter from DFEH. Cal. Govt. Code § 12960(d); *Rodriguez v. Airborne Express*, 265 F.3d 890, 896 & n.5 (9th Cir. 2001). Claims that are not raised before the DFEH are barred for failure to exhaust administrative remedies. *See Rodriguez*, 265 F.3d at 897. Here, plaintiff did not file any complaint with DFEH. (Champagne Decl., Ex. A at 298:19-24;

Champagne Decl., Ex. B.) Therefore, her FEHA claims for unlawful termination and for failure to engage in the interactive process are barred.

### D.     Wrongful Termination in Violation of Public Policy

Plaintiff's common law tort claims for wrongful termination in violation of public policy are not subject to the requirement of exhausting administrative remedies. *See Stevenson v. Superior Court*, 941 P.2d 1157, 1171 (Cal. 1997). However, these claims do rely on FEHA for its statement of a public policy against discrimination. *See id.*

The proper legal framework for determining whether Plaintiff's claims should survive summary judgment is the familiar burden-shifting scheme set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, Plaintiff must establish a prima facie case of discrimination. *See id.*; *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 351-54 (Cal. 2000). To establish a prima facie case of unlawful termination, Plaintiff must show (1) she was a member of a protected class, (2) she was performing her job in a satisfactory manner, (3) her employment was terminated, and (4) circumstances suggest a discriminatory motive. *See Guz*, 24 Cal.4th at 355; *see also Nidds. v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996). Whether Plaintiff has met this burden is a matter of law to be determined by the court. *Caldwell v. Paramount Unified Sch. Dist.*, 41 Cal. App. 4th 189, 201 (1995). If Plaintiff establishes a prima facie case, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. *See McDonnell Douglas*, 411 U.S. at 802. Then, in order to prevail, Plaintiff must demonstrate that the employer's alleged nondiscriminatory reason for the adverse employment decision was a pretext for a discriminatory motive. *See Guz*, 24 Cal.4th at 351-54; *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Plaintiff's evidence must be both specific and substantial to overcome the legitimate reasons set forth by the employer. *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir. 2002).

####         1.     Membership in a Protected Class

Plaintiff's complaint states that her termination was the result of discrimination because of medical condition and age. Plaintiff was over forty years of age at the time of her

termination, and is therefore in a protected class due to her age. Cal. Govt. Code § 12926(b). Regarding medical condition, it is clear from the facts alleged in the complaint that the medical condition referred to is Plaintiff's doctor-imposed work restriction—not to sit for long periods or lift more than 20 pounds—that was the result of her injuries to her back and spine. While FEHA does state a public policy against discrimination because of medical condition, medical condition is narrowly defined by Cal. Govt. Code § 12926(h) as health impairments associated with cancer or genetic characteristics, which Plaintiff admits she does not have. Plaintiff's physical injuries are more properly characterized as a physical disability, which includes musculoskeletal conditions that limit a major life activity. Cal. Govt. Code § 12926(k). Discrimination on the basis of physical disability is included in FEHA's statement of public policy.

"The federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits." 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1219 (3d ed. 2004). From the facts alleged in the complaint, it is clear to the Court that the complaint adequately, albeit unclearly, states a claim for discrimination on the basis of physical disability. However, at oral argument, Defendant claimed to have no knowledge of any allegation of discrimination on the basis of physical disability, and stated that physical disability was not litigated thus far in the case.[6] While this could provide a basis for finding that the Defendant is prejudiced by the Court's liberal reading of the complaint, it is unnecessary for the Court to evaluate any prejudice here because the Plaintiff fails to meet her burden under the other elements of the claim, as discussed below.

---

[6] Defendant also argued that even if Plaintiff had a physical disability due to her doctor-imposed restrictions, those restrictions were lifted on July 11, 2003, prior to her termination. However, the lifting of the medical restriction does not eliminate Plaintiff's position as someone with a physical disability, as Cal. Govt. Code § 12926(k)(3) includes in that class individuals with a history or record of physical disabilities.

11

Plaintiff's opposition to summary judgment also alleges that she is in a protected class due to depression. She states that she learned during discovery that she had been diagnosed as depressed and alleges that the Defendant fired her in part because of that diagnosis. Plaintiff asks the Court to either include this depression in her existing complaint, or in the alternative, to grant leave to amend to add a claim for discrimination on the basis of depression. Depression may qualify as a mental disability under FEHA. Cal. Govt. Code § 12926.1(c) (listing clinical depression as a mental disability); *Auburn Woods I Homeowners Ass'n v. Fair Employment & Hous. Comm'n*, 18 Cal.Rptr.3d 669, 679 (Cal. App. 3d Dist. 2004).

There are no facts alleged in the complaint that even suggest any claims based on a diagnosis of depression. Regarding the request for leave to amend, "[a] trial court may deny such a motion if permitting an amendment would prejudice the opposing party, produce an undue delay in the litigation, or result in futility for lack of merit." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990). Here, granting leave to amend to state a claim for discrimination on the basis of depression would either prejudice the Defendant, as discovery has already closed, or produce an undue delay, as additional opportunity for discovery would need to be allowed. But most significantly, this claim appears to be futile for lack of merit. Plaintiff did not submit any additional evidence in her opposition supporting this new claim. At oral argument, Plaintiff's attorney claimed that documents existed supporting that claim, but he did not have them with him, and the Court ordered Plaintiff to submit any such documents by close of business that day. Plaintiff's attorney did so, but the documents submitted do not show any diagnosis of depression. The documents submitted (discussed above in the background) indicate that Plaintiff's doctor diagnosed her as having acute anxiety, with symptoms of being agitated, crying, and depressed. Even if leave to amend were granted to include discrimination because of mental disability on the basis of her acute anxiety, this claim would fail because, as discussed below, Plaintiff has not met her burden of showing the other elements of the claim.

**2.      Satisfactory Job Performance and Discriminatory Motive**

At summary judgment, the degree of proof necessary to establish a prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons*

*v. England,* 307 F.3d 1092, 1112 (9th Cir.2002) (quoting *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994)). Although the burden for establishing a prima facie case is an easy one to satisfy, Plaintiff has failed to do so. Plaintiff may qualify as a member of a protected class, and her termination is an adverse employment action, but she fails to show the other two prongs of the test: to demonstrate that she was performing her job in a satisfactory manner, and that circumstances suggest a discriminatory motive in her termination. Plaintiff admitted at oral argument that she violated American's employee policies, and the record shows that she was disciplined and given an opportunity to continue employment, but within a few months committed additional violations. Therefore, Plaintiff has failed to demonstrate that she was performing her job in a satisfactory manner.

In addition, Plaintiff has not shown any evidence that suggests the decision to terminate her employment had anything to do with her age or any disability. She has not shown any evidence of discriminatory intent on the part of Newton and the other managers who decided to terminate her employment, nor has she shown that other employees outside of her protected class were treated more favorably (i.e., disciplined less harshly) for the same or similar conduct. Plaintiff suggests that Jeung, the employee who Plaintiff told to upgrade passenger Hensley to first class, should also have been disciplined for making the upgrade. However, Jeung only made the upgrade at Plaintiff's insistence, and Jeung was the one who reported this improper upgrade to Newton. Furthermore, Plaintiff's first discipline was based only in part on the actual improper upgrade, and also on the misrepresentations that Plaintiff made in documenting the upgrade in Hensley's passenger record, and on Plaintiff's abusive and intimidating conduct towards other employees. Plaintiff also suggests that Gwen Wong, another employee, made an improper upgrade in May 2003 but was not disciplined.[7] Assuming that Wong made an improper upgrade, Newton stated that she had no knowledge of any improper upgrade, and if she had known, she would have investigated and determined if discipline was appropriate. (Newton Supp. Decl. ¶ 1.)

---

[7] Plaintiff cites to an excerpt of her own deposition for to support this allegation, but failed to include that excerpt in the record submitted to the Court.

13

Plaintiff has not met her burden to demonstrate the existence of a prima facie case of either physical disability, mental disability, or age discrimination because she is unable to demonstrate that she was performing her job in a satisfactory manner or that there are any circumstances suggesting discriminatory intent. Therefore, summary judgment on her claims is properly granted. However, even assuming *arguendo* that Plaintiff had established a prima facie case, summary judgment is still warranted because American has asserted a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff has failed to demonstrate the reason is merely pretext.

### 2. American Has Demonstrated Legitimate Business Reasons for Terminating Plaintiff's Employment.

Even if Plaintiff could successfully establish a prima facie case of age or disability discrimination, the undisputed facts demonstrate that American had legitimate business reasons to terminate Plaintiff's employment. Failure to perform in accordance with the standards set by the employer is sufficient to constitute a legitimate business reason for termination. *See Hersant v. Dept. of Social Servs.*, 57 Cal. App. 4th 997, 1007-1010 (1997). The record demonstrates that Plaintiff violated American's policies, and she admitted at oral argument that she violated the policies. Defendant has met its burden of demonstrating legitimate business reasons for terminating Plaintiff's employment.

### 3. Plaintiff Fails to Raise an Issue of Disputed Fact Regarding Pretext.

Because Defendant presents evidence demonstrating a legitimate nondiscriminatory reason for the termination, Plaintiff bears the burden of demonstrating that Defendant's articulated reason is pretextual. Plaintiff may do so "either [1] directly by persuading the court that a discriminatory reason more likely motivated the employer or [2] indirectly by showing that the employer's proffered explanation is unworthy of credence." *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1437 (9th Cir. 1990) (internal cites and quotations omitted).

Plaintiff fails to refute American's legitimate non-discriminatory reasons for termination. Plaintiff's theory of pretext is that Newton had a personal animosity towards Plaintiff, which led Newton to find justifiable reasons to terminate Plaintiff's employment. She

bases this animosity on Newton's email to Stefek, in which Newton stated her belief that Plaintiff had a history of violating company policy, and stated that she would like to catch Plaintiff in the act. However, any animosity on Newton's part here appears to be based on Newton's opinion of Plaintiff as a less-than-model employee, not upon any protected characteristics such as age or disability. Legitimate, non-discriminatory reasons are "reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of *discrimination*." *Guz*, 24 Cal.4th at 358. These reasons need not be wise or correct, so long as they are nondiscriminatory and honestly believed by the employer. *Id*. Plaintiff has not provided any evidence that American's articulated reasons for firing Plaintiff were pretext for a discriminatory reason.

### E. ERISA Claim

Plaintiff's last remaining claim is for violation of 29 U.S.C. § 1140, which prohibits, *inter alia*, terminating an employee for the purpose of interfering with that employee's attainment of rights under an employee benefit plan. The Ninth Circuit has adopted the *McDonnell-Douglas* burden shifting framework in analyzing claims under § 1140. *Lessard v. Applied Risk Mgmt.*, 307 F.3d 1020, 1025 (9th Cir. 2002). Here, as with Plaintiff's claims for wrongful termination in violation of public policy, Plaintiff provides no evidence suggesting that American terminated her employment with an intent to interfere with her benefits, and no evidence suggesting that American's reasons for terminating her employment were pretext for an intent to interfere with her benefits. Therefore, summary judgment is properly granted on this claim.

////
////
////
////
////
////
////

**CONCLUSION**

For the foregoing reasons, Defendant American's motion for summary judgment is GRANTED on all causes of action. Judgment shall be entered in favor of Defendant and against Plaintiff.

**IT IS SO ORDERED.**

Dated: March 22, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE